*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FCA US LLC,

      Plaintiff/Counterdefendant-Appellee,

v

KAMAX INC,

      Defendant/Counterplaintiff-Appellant,

and

KAMAX MEXICO S DE RL DE CV,

      Defendant.

FOR PUBLICATION
May 14, 2025
3:35 PM

No. 371234
Oakland Circuit Court
LC No. 2024-205863-CB

Before: M. J. KELLY, P.J., and SWARTZLE and ACKERMAN, JJ.

PER CURIAM.

The present case is a breach of contract action involving the Uniform Commercial Code (UCC), MCL 440.1101 *et seq*. The basic issue presented is whether the contract between the parties relating to the sale of auto parts constitutes a "requirements" contract or a "release-by-release" contract. Plaintiff/counterdefendant, FCA US LLC (FCA), maintains that the contract is a requirements contract, while defendant/counterplaintiff, Kamax Inc. (Kamax), asserts that it is a release-by-release contract. Applying this Court's decision in *Cadillac Rubber & Plastics, Inc v Tubular Metal Sys, LLC*, 331 Mich App 416; 952 NW2d 576 (2020), the trial court concluded that the contract was a requirements contract. As a result, the court denied Kamax's motion for summary disposition and denied Kamax's motion to dissolve a preliminary injunction requiring Kamax to continue to deliver parts to FCA. Kamax appeals now by leave granted.[1] We affirm for the reasons stated in this opinion.

---

[1] This Court initially denied Kamax's application for interlocutory leave to appeal, *FCA US LLC v Kamax Inc*, unpublished order of the Court of Appeals, issued August 15, 2024 (Docket

-1-

## I. BASIC FACTS

FCA, formerly known as Chrysler Group, LLC, manufactures vehicles in Michigan and elsewhere. Kamax manufactures fasteners for the automotive industry. Kamax supplies parts to FCA, and the parties operate under a document called "PRODUCTION AND MOPAR PURCHASING GENERAL TERMS AND CONDITIONS" (the Terms and Conditions). Under the Terms and Conditions, Kamax agreed to sell and deliver goods to FCA in exchange for payment. The Terms and Conditions contain various general terms governing the parties' relationship, including that time is of the essence, that prices are "firm and not subject to adjustment," and that FCA may provide Kamax "with estimates, forecasts, or projections of its anticipated future quantity requirements for goods."

The Terms and Conditions provide general terms that govern the parties' relationship, and these Terms and Conditions are then incorporated into subsequent Purchase Orders. Kamax has supplied FCA with approximately 180 different parts. For each part there is a separate Purchase Order. The respective Purchase Order and the Terms and Conditions constitute the parties' contract relative to each part. The Purchase Orders specify the specific part at issue and the unit price for that part. They also contain language providing that the Purchase Order is effective "through the life of the program." Additionally, all the Purchase Orders contain the follow quantity information: "This order is for approximately 65%-100% of our requirements." According to FCA, Kamax is in fact its sole supplier for the parts in question, meaning that FCA orders 100% of its parts from Kamax.

In 2023, Kamax requested renegotiation of the price FCA pays for the parts, and the parties entered into an accommodation agreement. In December 2023, Kamax notified FCA that it was increasing prices, and that it would cease deliveries under the existing agreements after February 20, 2023. In response, FCA brought the instant action against Kamax for breach of contract. The trial court granted FCA's motion for a temporary restraining order. Kamax filed a counterclaim for unjust enrichment, common-law conversion, and statutory conversion. Thereafter, Kamax moved for summary disposition under MCR 2.116(C)(10) and for dissolution of the injunction. As noted above, the trial court denied both motions. This appeal follows.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Kamax argues that the trial court erred by denying its motion for summary disposition. Specifically, Kamax argues that the trial court erred in following *Cadillac Rubber*, 331 Mich App 416, as controlling authority because *Cadillac Rubber* was implicitly overruled by our Supreme Court. A trial court's decision on a motion for summary disposition is reviewed de novo. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Issues concerning the interpretation

---

No. 371234). Kamax appealed to the Supreme Court, which remanded to this Court "for consideration as on leave granted." *FCA US, LLC v Kamax Mexico S de RL de CV*, ___ Mich ___ (2024) (Docket No. 167461).

and application of a statute are also reviewed de novo. *Eggleston v Bio-Medical Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003).

## B. ANALYSIS

"Under Michigan law, contracts for the sale of goods—including supplier contracts—are governed by the [UCC]." *MSSC, Inc v Airboss Flexible Prods Co*, 511 Mich 176, 180; 999 NW2d 335 (2023). "The UCC contains a statute-of-frauds provision that governs which agreements must be in writing." *Id*. The statute-of-frauds provision is stated in MCL 440.2201(1), and provides:

> Except as otherwise provided in this section, a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.

MCL 440.2306 provides:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

As noted, the current case involves written contracts with a quantity term as follows: "This order is for approximately 65%-100% of our requirements." The question is whether this term satisfies the statute of frauds requirement that the quantity for a sale-of-goods contract over $1,000 be in writing. In *Cadillac Rubber*, 331 Mich App at 429-430, this Court addressed a similar provision involving a quantity stated in a range "between one part and 100% of [the buyer's] requirements," and this Court concluded that the contract constituted a valid requirements contract.

The *Cadillac Rubber* Court began by rejecting an argument that requirements contracts must be exclusive and that "all" of a buyer's needs must be fulfilled by the seller. *Id*. at 426-427. The Court concluded that such an assertion was not supported by MCL 440.2306(1) or the official comment to the statute, concluding instead that "a requirements contract may exist where all or some of the purchaser's requirements are purchased from the seller." *Id*. at 427 (quotation marks and citation omitted). Looking to federal courts for persuasive guidance, the *Cadillac Rubber* Court then determined that the quantity range at issue satisfied the statute of frauds because the UCC contemplates that a quantity may be indefinite. *Id*. at 427-430. In concluding that such indefinite terms are permissible, the Court emphasized the good faith and customary practices that

govern such relationships. *Id.* at 429. Turning to the specific contract language before it, the Court concluded:

> In the present case, the evidence indisputably establishes that the parties have a requirements contract. Tubular issued two purchase orders, one in 2012 and another one in 2016, that incorporated its terms and conditions. The purchase orders both noted, "MATERIAL REQUIREMENT WILL BE RELEASED WEEKLY." Tubular's terms and conditions likewise provided for the issuance of material authorization releases under which Tubular was obligated to purchase from Avon a quantity between one part and 100% of Tubular's requirements. The fact that Tubular was not required by the terms and conditions to purchase 100% of its requirements from Avon is not dispositive. As noted, a requirements contract need not be exclusive to be enforceable. . . . We find these federal precedents persuasive and we choose to follow them.
>
> It is undisputed that the parties have performed consistently with the contractual documents since 2012. Tubular has regularly issued material authorization releases setting forth the quantity of parts needed as well as a reasonable forecast of future requirements, and Avon has fulfilled those releases by providing the required parts. Avon does not claim or present evidence that Tubular has failed to comply with its obligation under MCL 440.2306(1) to act in good faith in determining its requirements.
>
> In sum, the trial court correctly determined that the pertinent documents, including the purchase orders, Tubular's terms and conditions, and the material authorization releases, when considered together, established the existence of a requirements contract as a matter of law. [*Id.* at 429-431.]

Under *Cadillac Rubber*, the 65% to 100% range stated on the purchase orders qualifies as a quantity term sufficient to establish a requirements contract. Kamax, however, argues that this Court should overrule *Cadillac Rubber* because it irreconcilably conflicts with *Airboss*, which was decided after *Cadillac Rubber*. As a published decision of this Court issued on or after November 1, 1990, this Court is bound to follow *Cadillac Rubber* unless it has "been reversed or modified by the Supreme Court" or a conflict panel of this Court. See MCR 7.215(J)(1). However, "[t]his Court may not follow *any* opinion previously decided by this Court, no matter when, to the extent that opinion conflicts with binding precedent from our Supreme Court . . . ." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 115; 923 NW2d 607 (2018). We must, therefore, determine if *Cadillac Rubber* conflicts with *Airboss*.

In *Airboss*, the contract at issue did "not contain a quantity term." *Airboss*, 511 Mich at 190. Indeed, the Supreme Court distinguished the facts of *Airboss* from those in *Cadillac Rubber* on this basis, stating:

> As an initial matter, we agree with the Court of Appeals in *Cadillac Rubber* that requirements contracts do not always have to be exclusive. A seller can agree to provide a nonexclusive part of the buyer's total need. But the trial court in this matter relied on *Cadillac Rubber* to find that the use of a blanket purchase order

combined with a substantial history of prior dealings between the parties created a requirements contract that bound Airboss. This was erroneous because in *Cadillac Rubber*, the Court found the existence of a quantity term—"a quantity between one part and 100%"—which therefore allowed it to use evidence of past practice (or parol evidence) to discern the parties' intent. [*Id.* at 194.]

In a footnote, the Court expressly addressed the defendant's argument that the Court should overrule *Cadillac Rubber*:

> [The defendant] has urged us to overrule the holding in *Cadillac Rubber* that the purchase order's language providing for "a quantity between one part and 100%" constituted a proper quantity term for a nonexclusive contract under MCL 440.2201(1), thus allowing for the use of parol evidence to determine the parties' intent as to the existence of a requirements contract. [The defendant] urges us instead to adopt the position taken in [*Acemco, Inc v Olympic Steel Lafayette, Inc*, unpublished per curiam opinion of the Court of Appeals, issued October 27, 2005, 2005 WL 2810716 (Docket No. 256638), p 5], which held that a requirements contract cannot grant "complete discretion" to the buyer because " '[a]ny' quantity is in fact no quantity at all." We decline to address this apparent inconsistency today because, in this case, there was no quantity term set forth in the purchase order or in any other document. Whether *Cadillac Rubber* and *Acemco* can be reconciled and, if not, which is correct remain questions for another day. [*Airboss*, 511 Mich at 194 n 4.]

Kamax suggests the issue left "for another day" is whether *Cadillac Rubber* remains good law after *Airboss* was decided. However, nothing in footnote 4 indicates that there is a conflict between *Cadillac Rubber* and *Airboss*. Instead, the Supreme Court acknowledged an inconsistency between *Cadillac Rubber* and this Court's unpublished decision in *Acemco*. The Court expressly declined to consider which case reached the correct result, leaving *that* question "for another day."[2]

More generally, Kamax appears to argue that *Cadillac Rubber* is inconsistent with *Airboss*'s general explanation of requirements contracts insofar as *Airboss* recognized that a requirements contract requires a quantity term. However, the necessity of a quantity term is not a new holding from *Airboss*. It is a basic principle of the statute of frauds applicable to UCC contracts involving the sale of goods over $1,000. Indeed, *Cadillac Rubber* addressed the contract language at issue in light of the statute of frauds and discussed the precision that is required for a quantity term. Further, while Kamax appears to argue for a quantity term that "specifies a precise set share," *Airboss* did not make such a holding. Instead, consistent with *Cadillac Rubber*, the Court in *Airboss* recognized that "[a] requirements contract can be nonspecific as to the quantity, but it must still have a quantity term that can be evaluated further using parol evidence." *Airboss*,

---

[2] The Supreme Court is free to entertain the question whether *Cadillac Rubber* or *Acemco* reached the correct result and to decide whether *Cadillac Rubber* should be overruled. But this Court is bound to follow *Cadillac Rubber*—not *Acemco*—because *Cadillac Rubber* is a published decision. See MCR 7.215(C), (J)(1).

511 Mich 191. Under *Cadillac Rubber*'s reasoning, a specified range—as in this case, 65% to 100%—may be nonspecific, but it is a quantity that can be evaluated further using parol evidence. See *id*. at 194 (distinguishing *Cadillac Rubber* on this basis). *Airboss*, however, did not involve such a range, nor did *Airboss* consider the permissibility of such a range. Instead, as quoted above, *Airboss* expressly declined to address *Cadillac Rubber*'s holding that "the purchase order's language providing for 'a quantity between one part and 100%' constituted a proper quantity term for a nonexclusive contract under MCL 440.2201(1), thus allowing for the use of parol evidence to determine the parties' intent as to the existence of a requirements contract." *Id*. at 194 n 4. *Cadillac Rubber*'s holding, therefore, was left intact by the Supreme Court in *Airboss*.

In sum, *Airboss* and *Cadillac Rubber* are distinguishable and do not conflict. The contract in *Cadillac Rubber* provided "that Buyer shall purchase no less than one piece or unit of each of the Supplies and no more than one hundred percent (100%) of Buyer's requirements for the Supplies." *Cadillac Rubber*, 331 Mich App at 419-420. In *Airboss*, in contrast, the contracts contained no minimum term. *Airboss*, 511 Mich at 195. Here, because the contract at issue requires FCA to purchase between 65% and 100% of its needs from Kamax, *Cadillac Rubber* governs, not *Airboss*. Under the reasoning in *Cadillac Rubber*, the purchase order's language providing for a quantity between 65% and 100% constituted a proper quantity term for a nonexclusive contract under MCL 440.2201(1). As a result, parol evidence can be used to determine the parties' intent as to the existence of a requirements contract. We therefore conclude that *Cadillac Rubber* is the controlling authority.

Kamax's argument that the trial court erred in denying its summary disposition motion and in allowing the injunction to remain in place is entirely based upon the premise that *Cadillac Rubber* is no longer binding authority. Kamax is not entitled to summary disposition because it cannot demonstrate that it is entitled to judgment as a matter of law. With respect to the injunction, FCA bore the burden "of proving that the traditional four elements favor the issuance of a preliminary injunction." *Hammel v Speaker of the House of Representatives*, 297 Mich App 641, 648; 825 NW2d 616 (2012) (quotation marks and citation omitted). The trial court must consider

> whether (1) the moving party made the required demonstration of irreparable harm, (2) the harm to the applicant absent such an injunction outweighs the harm it would cause to the adverse party, (3) the moving party showed that it is likely to prevail on the merits, and (4) there will be harm to the public interest if an injunction is issued. [*Detroit Fire Fighters Ass'n, IAFF Local 344 v Detroit*, 482 Mich 18, 34; 753 NW2d 579 (2008).]

The only one of these factors at issue in this appeal is FCA's likelihood of prevailing on the merits. Because *Cadillac Rubber* is valid controlling authority, Kamax cannot demonstrate that FCA is unlikely to prevail. The court, therefore, did not abuse its discretion in declining to dissolve the injunction. See *Hammel*, 297 Mich App at 647.

Affirmed.  FCA may tax costs as the prevailing party.  MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Brock A. Swartzle
/s/ Matthew S. Ackerman